**KHALE J. LENHART, #7-4581**
**CATHERINE M. MERCER, #7-6320**
Hirst Applegate, LLP
P. O. Box 1083
Cheyenne, WY 82003-1083
Phone: (307) 632-0541
Fax: (307) 632-4999
klenhart@hirstapplegate.com
cmercer@hirstapplegate.com

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| MAGATTE WADE, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| vs. | } | Civil No. 25-00285-SAH |
| | } | |
| PROSPERA AFRICA LLC, NEWAY | } | |
| CAPITAL LLC, ERICK BRIMEN, | } | |
| NICHOLAS DRANIAS, and | } | |
| TOM MURCOTT, | } | |
| | } | |
| Defendants. | } | |

## FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Magatte Wade hereby files her First Amended Complaint and Jury Demand (the "Complaint") against Prospera Africa LLC, NeWay Capital LLC, Erick Brimen, Nicholas Dranias and Tom Murcott (collectively, the "Defendants"), and states the following in support:

### INTRODUCTION

1.    Plaintiff Magatte Wade wanted nothing more than for her and Defendants Prospera Africa LLC, NeWay Capital LLC, Erick Brimen, Nicholas Dranias and Tom Murcott to amicably part ways.

2.     Ms. Wade has been a lifelong advocate for increasing opportunities for prosperity in Africa and joined forces with Prospera Africa—first as an independent contractor and later as Chief Operating Officer and unit holder—under the good faith belief that Prospera Africa and NeWay Capital and individual defendants Brimen, Dranias, and Murcott would further that mission.

3.     Unfortunately, what could have been an amicable business divorce turned acrimonious when Defendants repeatedly made false statements to third parties that Ms. Wade committed crimes while attempting to withdraw from Prospera Africa. Ms. Wade now brings this defamation action to protect her reputation.

## PARTIES

4.     Plaintiff Magatte Wade is a Senegalese businesswoman who has dedicated her life to unlocking prosperity in Africa. She focuses on the role of free markets in creating prosperity, dignity, and well-being for Africans. Ms. Wade formerly served as the Chief Operating Officer of Defendant Prospera Africa. She resides near Austin, Texas, and her mailing address is PO Box 163126, Austin, Texas, 78716.

5.     Defendant Prospera Africa LLC ("Prospera Africa" or the "Company") is a Wyoming limited liability corporation with its principal place of business located at Beta Building, Oficina Modulo 1, St. John's Bay, Prospera Zede, in Roatán, Honduras.

6.     Defendant NeWay Capital LLC ("NeWay Capital") is a Wyoming limited liability corporation with its principal place of business located at 1875 Connecticut Avenue NW, Washington, DC 20009.

7.     Defendant Erick Brimen is the CEO and a member of the Board of Directors for Prospera Africa. He is also the CEO of NeWay Capital. On information and belief, he resides in Roatán, Honduras.

8.     Defendant Nicholas Dranias is the General Counsel for both Prospera Africa and NeWay Capital. On information and belief, he resides in Phoenix, Arizona.

9.     Defendant Tom Murcott is a member of the Board of Directors for NeWay Capital. On information and belief, he resides in Easton, Maryland.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy as to each Plaintiff exceeds $75,000.00, exclusive of interests and costs.

11.     Defendant Prospera Africa LLC is a limited liability company organized under the laws of Wyoming. For purposes of diversity jurisdiction, Defendant Prospera Africa has the citizenship of its members. Upon information and belief, none of its members are citizens of Texas.

12.     Defendant NeWay Capital is a limited liability company organized under the laws of Wyoming. For purposes of diversity jurisdiction, Defendant NeWay Capital has the citizenship of its members. Upon information and belief, none of its members are citizens of Texas.

13.     Upon information and belief, Defendant Erick Brimen is not a citizen of Texas.

14.     Upon information and belief, Defendant Nicholas Dranias is a citizen of Arizona.

15.     Upon information and belief, Defendant Tom Murcott is a citizen of Washington, District of Columbia.

16.    This Court has personal jurisdiction over Defendant Prospera Africa pursuant to the fact that Prospera Africa is organized under the laws of Wyoming, according to filings with the Wyoming Secretary of State.

17.    This Court has personal jurisdiction over Defendant NeWay Capital pursuant to the fact that NeWay Capital is organized under the laws of Wyoming, according to filings with the Wyoming Secretary of State.

18.    This court has personal jurisdiction over Erick Brimen pursuant to Wyo. Stat. § 5-1-107(a) because he is the CEO and a member of the Board of Directors for Prospera Africa. He is also the CEO of NeWay Capital. On information and belief, Mr. Brimen was an active participant in management and governance decisions and has signed shareholder agreements with Wyoming choice of law provisions. Mr. Brimen's tortious acts were directed at Ms. Wade and related to her role with Wyoming limited liability companies. Mr. Brimen's tortious conduct also relates to his role with the Wyoming entities. Therefore, Mr. Brimen has sufficient minimum contacts with the state of Wyoming and has otherwise purposefully availed himself of this forum.

19.    This court has personal jurisdiction over Nicholas Dranias pursuant to Wyo. Stat. § 5-1-107(a) because he is the General Counsel for both Prospera Africa and NeWay Capital. On information and belief, Mr. Dranias was an active participant in management and governance decisions and has signed shareholder agreements with Wyoming choice of law provisions. Mr. Dranias's tortious acts were directed at Ms. Wade and related to her role with Wyoming limited liability companies. Mr. Dranias's tortious conduct also relates to his role with the Wyoming entities. Therefore, Mr. Dranias has sufficient minimum contacts with the state of Wyoming and has otherwise purposefully availed himself of this forum.

20.    This court has personal jurisdiction over Tom Murcott pursuant to Wyo. Stat. § 5-1-107(a) because he is a member of the Board of Directors for NeWay Capital. On information and belief, Mr. Murcott was an active participant in management and governance decisions and has signed a shareholder agreement with a Wyoming choice of law provision. Mr. Murcott's tortious acts were directed at Ms. Wade and related to her role with Wyoming limited liability companies. Mr. Murcott's tortious conduct also relates to his role with the Wyoming entities. Therefore, Mr. Murcott has sufficient minimum contacts with the state of Wyoming and has otherwise purposefully availed himself of this forum.

21.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims set forth in this complaint occurred within this judicial district and/or involved entities based in this judicial district and their managers and directors, and because the Defendants are subject to personal jurisdiction within this judicial district.

22.    Prospera Africa's Operating Agreement (dated April 23, 2024) contains an arbitration clause covering disputes "arising out of the terms and conditions of this Agreement," and Ms. Wade's Independent Contractor Agreement (dated November 13, 2024) contains an arbitration clause covering disputes "arising out of, relating to, or involving all or any part of th[at] Agreement." Because Ms. Wade's defamation and tortious interference claims raised herein do not stem from any part of those agreements—especially given that Defendants' defamatory statements were made after she left the Company—these clauses do not apply here. Ms. Wade is unaware of any other arbitration clauses that would even possibly bind this action.

## UNDERLYING FACTUAL ALLEGATIONS

### I.    Ms. Wade's Reputation

23.    Born in Senegal and raised in France, Ms. Wade is an entrepreneur and author dedicated to unlocking prosperity in Africa by catalyzing entrepreneurship and innovation. For many years, she has worked to achieve this goal by sharing the blueprint of Africa's economic revolution, speaking about the myths and realities of business in Africa, and working with governments around the world to advocate for more favorable business climates.

24.    Through these efforts, Ms. Wade has developed a strong reputation among her business contacts as a person with expertise on economic development in the continent of Africa. Nonetheless, she is a private individual. She is not a general or limited purpose public figure.

25.    For 15 years, Ms. Wade has championed the creation of "Special Economic Zones," or strategically designated areas within a country that aim to enhance economic growth through the passage of unique regulatory measures and legislation, with countless members of her network.

### II.    The Origins of the Parties' Relationship

26.    In 2022, Ms. Wade was introduced to Defendant Erick Brimen and his team via their shared interest in Special Economic Zones to begin a Special Economic Zone in Benin. Mr. Brimen had previously pursued a zone development project in Roatán, Honduras, which ended in a lawsuit between Mr. Brimen and the Honduran government. Mr. Brimen did not have meaningful contacts in Benin or anywhere else in Africa, nor did he have experience obtaining legislation for Special Economic Zones. Accordingly, he understood that Ms. Wade's unique combination of contacts, reputation, and experiences would prove to be invaluable going forward into proposed expansions across the continent.

27.    That year, Africa Unchained, an entity created by Ms. Wade and Mr. Brimen, entered into a Memorandum of Understanding with the Beninese government to develop such a zone—their first.

28.    In November 2023, Ms. Wade and NeWay Capital agreed Ms. Wade would hold the title of Co-Founder of Prospera Africa, a newly created entity.

29.    The following spring, Mr. Brimen formally chartered Prospera Africa in Wyoming and presented Ms. Wade with Prospera Africa's Operating Agreement. Mr. Brimen offered Ms. Wade ███████████████████████████████████████████████████████████

███████████████████████████████████████

30.    Attachment A to the Operating Agreement, which is styled as an "Assignment of Intellectual Property" (the "Original IP Assignment"), purports to document that she assigned all of the following to Prospera Africa on April 23, 2024:



31.    What Attachment A characterizes as "Intellectual Property" is instead effectively the intangible value of her life's work—including her entire personal and professional network and

all of her economic development know-how. Ms. Wade was unrepresented by counsel when she signed the Agreement.

32. ████████████████████████████████████████████████████████
████████████████████████████████████████████

33.     Ms. Wade's understanding of the Original IP Assignment at the time was that she was being asked to use her skills, experience, contacts, reputation, and know-how to support Prospera Africa's efforts. Ms. Wade was prepared to, and in fact did, put forth her best efforts in that regard for the duration of her tenure with Prospera Africa.

34.     Indeed, upon formally joining Prospera Africa, Ms. Wade began to leverage her extensive network across the African continent and eventually found that Uganda—rather than Benin or Zanzibar, both of which were explored in detail—showed the most promise for the Company's first Special Economic Zone. Through one of her oldest friends and closest business contacts, Ms. Wade was introduced to two key Ugandan stakeholders: Robert Kirunda, a Stanford-educated attorney and Advocate of the Courts of Judicature in Uganda, and Kwame Rugunda, a prominent entrepreneur and the son of Uganda's most recent Prime Minister. She nurtured both relationships for more than a year, worked with them to formulate strategies to pass legislation for a Special Economic Zone in Uganda, and eventually introduced them to Mr. Brimen and the Prospera Africa team.

35. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████

### III.   Prospera Africa Offers Ms. Wade the Title of CEO, but the Parties' Negotiations Break Down

36.    In spring 2025, as the project in Uganda began to crystallize, Ms. Wade initiated

conversations about changing the Company's structure to lay a foundation for success. 

37.

38.

39.    After several months of frustrating negotiations, Ms. Wade realized that she was being used as a mere networking source whose vision and accomplishments on the ground were not respected—and that she did not have a future with Prospera Africa.

### IV.   Ms. Wade Exits the Company

40.    On September 10, 2025, Ms. Wade provided the Company with 30 days' notice of her resignation. She also delivered notice of her intent to withdraw as a member and worked with counsel to execute a stock transfer and related IP Assignment (the "2025 IP Assignment")

███████████████████████████████████████████████████

████████████████████████████████████

41.     Upon learning of Ms. Wade's resignation, Mr. Brimen was furious. She was his companies' main conduit to the necessary local stakeholders to build Special Economic Zones in Uganda, Benin, and elsewhere in Africa. Without Ms. Wade, Mr. Brimen, and Prospera Africa do not have the connections, social capital, or resources necessary for any Special Economic Zone to move forward anytime soon. He sought to punish Ms. Wade, deprive her of a career, and steal her contacts for himself.

## V.     Defendants Try to Stop Ms. Wade from Leaving

42.     On September 22, 2025, Mr. Brimen convened a special emergency meeting of Prospera Africa's Board of Directors—scheduled precisely to occur when Ms. Wade had told him she would be attending her best friend's funeral—and the board then unilaterally ███████████ ███████████████████████████████████████

43.     Ms. Wade requested that the meeting be rescheduled, but Mr. Brimen made clear that he would only do so on the precondition that Ms. Wade agree to withdraw her resignations and notices of termination and submit to his previously rejected proposals on employment and governance of the Company, which were the intended topics of that meeting. In his responsive email, ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

44.     Attendees of and invitees to the meeting included Defendants Tom Murcott, Mr. Brimen, and Mr. Dranias.

45.     After returning from her best friend's funeral, Ms. Wade tried to understand what happened during the board meeting. However, Mr. Brimen refused to provide meeting minutes unless she met all of his demands.

46.     Following repeated requests, Ms. Wade eventually received meeting minutes, which indicate that █████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████████

47.     These statements and implications were patently false—Ms. Wade *committed zero crimes*. Rather, Defendants now attempt to reframe the 2025 IP Assignment as a "violation of criminal law" for their own benefit and with the express intent of harming Ms. Wade.

48.     On information and belief, Defendants Brimen, Murcott, and Dranias all contributed to and affirmed these statements during the meeting.

## VI.    Defendants Defame Ms. Wade to Her Contacts

49.     Defendants proceeded to take this campaign a step further by reaching out to Ms. Wade's trusted contacts and falsely telling them that she had engaged in criminal behavior—all in hopes that these fabricated statements would cause Ms. Wade's contacts to join forces with Prospera Africa.

50.     *First and foremost*, Defendants repeatedly reached out to Robert Kirunda—Ms. Wade's friend and close contact, who has advised on legislation for Special Economic Zones in

─────────────────────

█████████████████████████████████████████████████████
███████████████████████

Uganda, to accuse Ms. Wade of criminal activity in hopes that Mr. Kirunda would terminate his relationship with Ms. Wade and start working with Prospera Africa instead.

51.    Specifically, Mr. Brimen and Mr. Murcott initiated a conversation with Mr. Kirunda on or about October 12, 2025, where they told him that Ms. Wade had "attempted to resign from the company and did so in a manner that was not lawful" and thereby "forced their hand" in terminating her. They tried to convince him to cut ties with her and move forward with Prospera Africa instead.

52.    In a follow-up email sent on or about October 14, 2025, Mr. Brimen told Mr. Kirunda that "we had been exploring with Magatte how to modify her equity and compensation package per her request in the context of forward momentum in Uganda" when she "crossed critical lines violating not just fiduciary duties but likely also tripping criminal behavior wires." He continued, "[t]he only thing I could imagine potentially driving the erratic and seemingly emotionally-driven behavior is the situation she's been facing with her dear friend that recently passed," and likewise stated that unspecified persons had previously "had very negative experiences with Magatte in the past – in the context of backing her as a public persona advocating for free markets." Mr. Brimen concluded that Ms. Wade's actions would have "serious legal implications" and once again asked Mr. Kirunda to "proceed in Uganda" with Prospera Africa.

53.    Mr. Brimen sent another email to Mr. Kirunda on October 17, 2025, telling him that Ms. Wade had "made increasingly unreasonable demands" during negotiations for her CEO contract and had come with an "attitude of unworkability and intransigence," before ultimately seeking "to transfer property to herself property she had contributed into the company as part of the agreement which underpinned her joining the company initially," which he characterized as "[p]roperty upon which we and investors relied upon when issuing equity." Mr. Brimen went on

to state that "Magatte's action was a brazen, immoral, and unlawful violation of fiduciary obligations, contractual commitments, and personal trust" and characterized it as an "irreversible violation" even though Prospera Africa had already nullified the request. Finally, in a last-ditch effort to bring Mr. Kirunda on board, Mr. Brimen invited him to a meeting in Dubai that would also include Mr. Murcott and Mr. Dranias.

54.    Mr. Kirunda is unaffiliated with Prospera Africa and has been since mid-2025. He is likewise unaffiliated with NeWay Capital.

55.    *Second*, on October 18, 2025, Mr. Brimen emailed Kwame Rugunda—another of Ms. Wade's close friends and legislative contacts in Uganda—stating that "the situation with Magatte is very serious," and asserting that "certain lines were crossed by her," which required management through "applicable legal channels," concluding that "we firmly believe her important leadership role is one that can be filled." As with his email to Mr. Kirunda, Mr. Brimen invited Mr. Rugunda to a meeting in Dubai and asked him to cut off Ms. Wade and "reorient ship and accelerate momentum" with Prospera Africa.

56.    Mr. Rugunda is unaffiliated with Prospera Africa and has been since mid-2025. He is likewise unaffiliated with NeWay Capital.

57.    *Third*, on or about October 22, Prospera Africa and NeWay Capital contacted Mort Taylor—an energy consultant and attorney who has also served as Ms. Wade's lawyer—through counsel, under the pretense of a preservation notice. Those communications told Mr. Taylor that Prospera Africa and NeWay Capital were "currently addressing serious governance and issues arising from actions taken by Ms. Wade during and after September 2025, and perhaps on other dates. While investigating these matters, we have identified certain circumstantial patterns that warrant careful examination."

13

58.     Mr. Taylor is unaffiliated with Prospera Africa and NeWay Capital. At the time Prospera Africa and NeWay Capital contacted Mr. Taylor (and until December 11, 2025), Mr. Taylor served as Ms. Wade's lawyer.

59.     On December 11, 2025, following the filing of this action, Mr. Taylor contacted Ms. Wade and demanded that she remove the complaint and all references to him from it. On information and belief, Ms. Wade understood the demand to be based on Mr. Taylor's fear that if he was associated with this lawsuit, there would be retribution from the Defendants—namely, that they would make defamatory statements about him that would negatively impact his reputation and business.

60.     Mr. Taylor's concerns regarding his involvement in this lawsuit further demonstrate the severity of Defendants' actions and their willingness to make defamatory statements as retribution to those who challenge them.

61.     On information and belief, Defendants' communication with Mr. Kirunda, Mr. Rugunda, and Mr. Taylor is just the tip of the iceberg. They are merely the three contacts who have chosen to sacrifice their future relationships with Prospera Africa and risk retributive legal action so they could notify Ms. Wade of the defamatory statements made about and against her.

62.     On information and belief, Mr. Kirunda and Mr. Rugunda have both chosen to disaffiliate with Prospera Africa as the result of the fabricated statements made by its principal—and Mr. Taylor has never had a direct relationship with Prospera Africa.

## VII.     Defendant Dranias Instructs Ms. Wade's Contacts to Delete Key Evidence in this Action

63.     Continuing Defendants' pattern of dishonest, evasive behavior, Mr. Dranias—who serves as General Counsel for both Prospera Africa and NeWay Capital—contacted witnesses and

instructed them *in writing* to delete potentially relevant evidence mere hours after Ms. Wade served a preservation notice on Prospera Africa. *See* **Exhibit 5** at 8; **Exhibit 6** at 3.

64.    Notably, the individuals contacted by Mr. Dranias included those to whom Defendants made the false and defamatory statements at issue in this action. In essence, then, Defendants' demands asked key third-party witnesses to delete evidence essential to Ms. Wade's claims.

65.    On information and belief, Defendants sent similar deletion requests to Ms. Wade's other friends or contacts.

## VIII.    Defendants' False Statements

66.    Defendants repeatedly and baselessly published false statements and implications that Ms. Wade had ███████████████████████████████████████████████████████
The false statements and implications at issue in this action include:

    a.    On September 22, 2025, Defendants told members of the Company's board that Ms. Wade made ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ Exhibit 1.

    b.    On September 22, 2025, Defendants told members of the Company's board that Ms. Wade's actions ████████████████████████████

███████████████████████████████████████████████████

███████████████████████ as the result of Ms. Wade's 2025 IP Assignment,

████████████████████████████ *Id.*

c.  On October 12, 2025, Defendants told Robert Kirunda that Ms. Wade had
    "attempted to resign from the company and *did so in a manner that was
    not lawful,*" which had thereby "forced their hand" in terminating her.

d.  On or about October 14, 2025, Defendants told Robert Kirunda that Ms.
    Wade "crossed critical lines violating not just fiduciary duties but likely also
    *tripping criminal behavior wires,*" creating "*serious legal implications.*"
    **Exhibit 2** at 4.

e.  On or about October 17, 2025, Defendants told Robert Kirunda that Ms.
    Wade sought "to *transfer to herself property she had contributed into the
    company* as part of the agreement which underpinned her joining the
    company initially," including "[p]roperty upon which we and investors
    relied upon when issuing equity," causing an "irreversible," "*brazen,
    immoral, and unlawful violation of fiduciary obligations, contractual
    commitments, and personal trust.*" **Exhibit 2** at 1–2.

f.  On October 18, 2025, Defendants told Kwame Rugunda that "the situation
    with Magatte [Wade] is *very serious,*" and "*certain lines were crossed by
    her*" that they would address through "*applicable legal channels.*" **Exhibit
    3**.

g.  On October 22, 2025, Defendants told Mort Taylor that the Company was
    "addressing *serious governance and issues arising from actions taken by
    Magatte Wade* during and after September 2025, and perhaps on other

16

dates" that were evident from "certain circumstantial patterns that warrant careful examination." **Exhibit 4** at 1.

67.     All of these false statements and implications were made to third parties unaffiliated with Prospera Africa or NeWay Capital.

68.     Nothing suggests that the Defendants will end their campaign of defaming Ms. Wade to her contacts in order to further damage her reputation. Ms. Wade has reason to believe that Defendants have made similar statements to Ms. Wade's other business contacts in Uganda, elsewhere in Africa, and beyond—including high-net-worth individuals in the United States who have previously backed Ms. Wade's projects.

69.     All of Defendants' statements and implications were false. Ms. Wade has never sought to steal or embezzle any Company assets, has never breached her fiduciary duties or engaged in self-dealing, and has never been charged with a crime, let alone convicted of one. At most, she made a good faith attempt to stage a mutually agreeable close of the parties' relationship.

70.     Ms. Wade has been harmed by these accusations that she committed a crime and/or engaged in improper and immoral misconduct. As such, these statements and implications are *per se* defamatory; harm to her reputation can be presumed. In addition, Defendants' false statements have harmed her ability to conduct business related to Special Economic Zones—Ms. Wade's life's work—or otherwise by damaging her reputation within the business community in which she operates. Business professionals will not work with someone they believe has violated their fiduciary duties or engaged in improper conduct in past business dealings.

71.     Relatedly, Defendants repeatedly made false statements and implications suggesting that Ms. Wade was erratic and unable to competently conduct business. The false statements and implications include:

a.  On or about October 14, 2025, Defendants told Robert Kirunda that Ms.
    Wade demonstrates 
    **Exhibit 2** at 4.

b.  On or about October 14, 2025, Defendants told Robert Kirunda that Ms.
    Wade's affiliates 

    *Id.*

c.  On or about October 16, 2025, Defendants told Robert Kirunda that Ms.
    Wade approached her relationship with the Company with an 
    stating that she made
    *Id.* at 1.

72.     All of these false statements and implications were made to third parties unaffiliated with Prospera Africa or NeWay Capital.

73.     All of these statements and implications are false. On the contrary, Ms. Wade simply sought to negotiate fair contracts with the Company and Mr. Brimen, and she is unaware of anyone who has had a "very negative" business experience with her, aside from the Company. These false statements were intended to convey the message that Ms. Wade is an unethical businessperson who cannot be trusted—a message that will undoubtedly cause Ms. Wade harm in her ability to conduct business in the future. Indeed, the fact that Defendants made these statements to key players from the small business community in which she operates guarantees that the statements will have the intended effect.

74.     It is telling that in these statements, Mr. Brimen did not disclose how Ms. Wade's behavior was erratic, nor did he provide any details regarding affiliates' alleged "negative

experiences" with Ms. Wade, Mr. Brimen's words nevertheless imply to a reasonable reader that Ms. Wade is unable to competently conduct business and would be an untrustworthy and dishonorable business partner.

75.     Ms. Wade has been harmed by these false statements about her character, her business acumen and judgment, and her ability to conduct business in the field of Special Economic Zones. As such, these statements and implications are *per se* defamatory; harm to her reputation can be presumed. It comes as no surprise, then, that Defendants' false statements have harmed, and will continue to harm, her ability to conduct business related to Special Economic Zones or otherwise.

## IX.    Defendants Acted with Actual Malice

76.     Defendants knew that the statements and implications they made about Ms. Wade were false and/or acted with a reckless disregard for whether the statements and implications were true. Defendants did not care whether or not their statements were true. Rather, they were motivated to harm Ms. Wade's reputation to damage her standing in the Special Economic Zone business community. Their statements were designed to punish Ms. Wade for failing to capitulate to their demands. They hoped that they would be able to pressure her into caving to their demands by attacking her reputation within the small business community she has worked in for years.

77.     Defendants' actual malice with respect to the above-described statements and implications regarding Ms. Wade is illustrated by the following facts, summarized here and expanded below:

a.     *First*, Defendants had no factual basis for their repeated statements and implications that Ms. Wade stole from Prospera Africa. Rather, Defendants made up these "crimes" whole cloth.

b.    *Second*, Defendants acted with clear, personal ill will toward Ms. Wade by falsely accusing her of misconduct in an attempt to discredit her in furtherance of interfering with and usurping her long-held relationships with business leaders in Benin.

**A.    Defendants' Defamatory Statements Were Fabricated—and They Knew It**

78.    Defendants' repeated claims that Ms. Wade committed "crimes" lack *any* support, because the supposed crimes never occurred.

79.    While there may be a good faith dispute between the parties regarding whether the Original IP Assignment is valid—and, by extension, whether the 2025 IP Assignment is effective or relevant—there is no possible legal argument that such a dispute amounts to a breach of Ms. Wade's fiduciary duties.

80.    Defendants likewise have no remotely colorable legal argument that Ms. Wade's request to transfer supposed "IP" back to herself—which the Company formally denied during the aforementioned September board meeting—somehow makes her a criminal or thief. Defendants knew that Ms. Wade's request in the 2025 IP Assignment was made through an attorney.

81.    In fact, the Company has taken explicitly contradictory positions on the subject: on one hand, that Ms. Wade criminally breached her fiduciary duty of loyalty ███████ ████████████████████████████ and on the other, that Ms. Wade's effort to make that exchange is ████████████████████ In other words, Defendants have explicitly denied Ms. Wade's 2025 IP Assignment, and thus know for a fact that she has not "taken" anything.

82.    Moreover, after accusing Ms. Wade of misconduct, Defendants tried to insist that she stay on the Company's board and recruit her as CEO with a significantly higher salary and equity package, refuting any notion that they actually believed she had engaged in misconduct.

83.    Similarly, there can be no reasonable dispute that Ms. Wade has exited the company in accordance with Wyoming law. *See* Wyoming LLC Act §§ 17-29-601 and 17-29-602.

84.    Therefore, there is no doubt that Defendants' published statements accusing Ms. Wade of criminal and immoral activity were knowingly fabricated, or at a minimum, purposefully avoidant of the truth. All defamatory statements made by Defendants were false.

85.    Defendants knew that the 2025 IP Assignment sought by Ms. Wade was a good-faith attempt to stage a mutually agreeable close of the parties' relationship and chose to mis-frame this effort for their own benefit and with the express intent of harming Ms. Wade.

**B.    Defendants' Defamatory Statements Were Made with Ill Will**

86.    Defendants' defamatory statements were made for several purposes, including:

a.    To punish Ms. Wade for deciding that she no longer had a future with the Company by stealing her professional contacts and ruining her professional reputation;

b.    To secure the Company's future on the African continent by usurping Ms. Wade's professional network; and

c.    To hide the fact that Ms. Wade returned her units and resigned from Prospera Africa due to serious concerns about its management, instead portraying her departure as being the result of Prospera Africa terminating her for cause.

87.    Without Ms. Wade's contacts, reputation, and goodwill, Prospera Africa stood little chance of securing the legislation or other logistics required to create Special Economic Zones in Africa. And given the breadth and depth of her professional relationships, Defendants decided that the only way they could utilize her network was by disseminating fabricated statements that Ms.

Wade had engaged in felonious conduct and otherwise behaved in unlawful, immoral, and erratic ways.

88.     On information and belief, Defendants fabricated these statements so that (i) Ms. Wade's contacts would think less of her, (ii) Ms. Wade's contacts would fear the legal and professional risks of continuing to associate or communicate with her, and (iii) they could usurp Ms. Wade's business relationships with these key industry contacts.

89.     Moreover, under Wyoming law, the only reason a unit holder would not be able to return her units and resign is if she breached her fiduciary duties to the company. This likewise explains why Defendants fabricated statements accusing Ms. Wade of criminal activity and breaches of fiduciary duty. They wanted to stop her from leaving so that they could force her to accede to their demands, as well as portray a false sense of corporate stability to the outside world.

90.     Of course, Ms. Wade's desire to discontinue her relationship with Prospera Africa is not a breach of any duty, much less a fiduciary one. Prospera Africa's circular logic fails on its face.

91.     Defendants certainly knew that making these statements to key business stakeholders was incompatible with Ms. Wade's continued efforts to conduct her business, trade, and profession insofar as they were intended to harm or eliminate her business relationships.

92.     Defendants' ill will is further underscored by their attempts to coerce witnesses into deleting evidence relevant to this defamation suit. *See supra* Part VII; **Exhibit 6**.

93.     As outlined above, Defendants likewise knew that their defamatory statements and implications were false, but decided to make them anyway.

94.    In sum, all Defendants acted deliberately and maliciously to injure Ms. Wade out of ill will, and/or causeless and wantonly made statements for the purpose of injuring Ms. Wade's reputation.

## X.    Ms. Wade's Reputation Has Been Irreparably Harmed

95.    Defendants' defamatory statements and implications represent a concerted campaign aimed at ruining Ms. Wade's professional reputation in furtherance of their own business aspirations and economic gain.

96.    Defendants' defamatory statements create the impression that Ms. Wade tried to embezzle from and/or otherwise violated the fiduciary duties she owed to Prospera Africa. By communicating this message to third parties, Defendants irreparably tarnished Ms. Wade's reputation.

97.    Ms. Wade's reputation as a businesswoman and expert regarding Special Economic Zones has been, and will continue to be, irreparably harmed as the result of Defendants' false statements.

98.    Notably, as a result of Defendants' defamatory statements, Ms. Wade's relationship with Mr. Taylor, Ms. Wade's business contact and former lawyer, has been irreparably damaged. Ms. Wade valued Mr. Taylor's expertise as an energy consultant, an area in which she has frequently needed expert support in the past and anticipates needing again in the foreseeable future. Ms. Wade and Mr. Taylor also discussed the possibility of Mr. Taylor investing in future projects and business opportunities that Ms. Wade develops. Because of the damage done to Ms. Wade and Mr. Taylor's relationship, Ms. Wade will be forced to expend resources to develop relationships with new energy consultants and potential investors, with no guarantee that she will be able to replicate Mr. Taylor's valuable relationship.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Defamation for False Statements and Implications)

99.     Ms. Wade repeats, realleges, and incorporates by reference the allegations in Paragraphs 1–98 of this Complaint as if fully stated herein.

100.    Defendants published false statements and implications to at least the Company board, Robert Kirunda, Kwame Rugunda, and Mort Taylor—and on information and belief, to others—that Ms. Wade engaged in criminal activity by trying to steal or embezzle over one million dollars from Prospera Africa. These false statements are set forth in Paragraphs 66–75 (and the exhibits referenced therein), which include the particular words and statements used. The false implications were intentionally made through the false statements themselves, by other statements that were misleading due to material omissions, by presenting misleading juxtapositions of statements, and when taking into account the context of each publication. The false implications were also made through the smear campaign as a whole.

101.    These false statements and implications were and would be reasonably understood by their readers to be statements of fact about Ms. Wade because they named her and were framed as definitive statements.

102.    These statements and implications were false for the reasons stated in Paragraphs 66–75 and 78–85, including that Ms. Wade's 2025 IP Assignment was proposed in good faith, with the assistance of counsel, and in accordance with all applicable laws.

103.    These statements and implications were published without privilege or legal authorization, and if there was any such privilege or authorization (and there was not), it was intentionally abused.

104. These statements were published or made to third parties, including the Company board, Robert Kirunda, Kwame Rugunda, and Mort Taylor—and on information and belief, others.

105. These statements and implications were defamatory *per se* because they charged Ms. Wade with a serious crime and improper or immoral conduct—including at least an attempt to steal or embezzle over one million dollars from Prospera Africa—and were of a nature tending to injure Ms. Wade in her trade, business, and profession, including her work on Special Economic Zones in Africa.

106. All Defendants acted with fault amounting to actual malice. Each Defendant knew that these defamatory statements and implications were false, or at least recklessly disregarded the truth or falsity of the statements and implications when they made the statements. The allegations related to Defendants' actual malice include but are not limited to those pleaded in Paragraphs 76–94.

107. As a result of Defendants' defamatory statements and implications, Ms. Wade has suffered damages in the form of harm to her reputation, loss of business opportunities, harm to her business relationships, emotional distress, as well as other damages, in an amount that will be proven at the trial of this matter.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
### (Tortious Interference with a Business Expectancy)

108. Ms. Wade repeats, realleges, and incorporates by reference the allegations in Paragraphs 1–107 of this Complaint as if fully stated herein.

109. Ms. Wade had a business expectancy with Robert Kirunda and Kwame Rugunda, among others, during all relevant time periods.

110. Defendants were aware of Ms. Wade's business expectancy when they made the defamatory statements listed at Paragraphs 66–75.

111.    Defendants' defamatory statements are an intentional improper interference with Ms. Wade's business expectancy. Indeed, those statements were designed to cause harm to Ms. Wade's relationships and opportunities with her business partners in furtherance of Defendants' usurpation of those relationships and opportunities.

112.    Ms. Wade has suffered damages as a result of Defendants' interference. The amount of those damages will be proven at the trial of this matter.

## JURY DEMAND

113.    Ms. Wade demands that this case be tried before a six-person jury and has paid the requisite jury fee.

## PRAYER FOR RELIEF

1.    Wherefore, Ms. Wade prays for judgment against Defendants for each cause of action raised herein. Ms. Wade respectfully requests a judgment in her favor and against Defendants for:

a.    Compensatory damages in an amount to be determined at trial;

b.    Actual, consequential, and special damages in an amount to be determined at trial;

c.    Punitive damages;

d.    Reasonable and necessary attorneys' fees;

e.    Reasonable and necessary costs of the suit;

f.    Prejudgment and post-judgment interest at the highest lawful rates; and

g.    Such other and further relief as this Court deems just and appropriate.

Dated: 23 December 2025.


MAGATTE WADE,
Plaintiff


BY: */s/ Khale J. Lenhart*
      **KHALE J. LENHART, #7-4581**
      **CATHERINE M. MERCER, #7-6320**
      OF HIRST APPLEGATE, LLP
      Attorneys for Plaintiff
      P. O. Box 1083
      Cheyenne, WY 82003-1083
      Phone: (307) 632-0541
      Fax: (307) 632-4999
      klenhart@hirstapplegate.com
      cmercer@hirstapplegate.com